RANDOLPH PERKINS

*v.*

DEAL BEACH REALTY COMPANY.

———

RANDOLPH PERKINS

*v.*

THE GEORGE A. SHIPMAN COMPANY.

———

RANDOLPH PERKINS

*v.*

JAMES W. BROOKS et al.

———

ANNA V. R. GREENE

*v.*

DEAL BEACH REALTY COMPANY.

———

SARAH L. ROBERTSON

*v.*

RANDOLPH PERKINS.

[Decided June 9th, 1920.]

1. A solicitor, in order to raise moneys to discharge a judgment against his client, procured part from the trust company, on the client's note, endorsed by him, and the balance from a trust estate. In order to indemnify him on his endorsement and to secure the trustee, the client assigned to him ten past-due bonds and mortgages aggregating $107,000, and the same were deposited under their joint control. At the same time

the solicitor began the foreclosure of the ten mortgages and a sale was had, certain of the properties (not all) being purchased at the sheriff's sale by a trustee for the client, thus discharging of record the security of the solicitor to that extent. Upon the delivery of the deeds the solicitor asked that the trustee execute to him five bonds and mortgages, for $8,000 each, on the property which she purchased, in substitution for those foreclosed, which security was less than the former pledge. The client says as to this request she demurred, unless the solicitor agreed to advance a sum sufficient to finish the uncompleted buildings on the premises to be covered by the new mortgages, and, upon the solicitor so agreeing, she directed her trustee to execute the bonds and mortgages sought to be foreclosed in this suit. This agreement is denied by the solicitor. He did, however, advance certain moneys which were applied toward completing the buildings. After the making of the bonds and mortgages in question the client conveyed the premises to the Deal Beach Realty Company. The client, in her pleadings, sets up this agreement, and prays that the foreclosure suits be stayed until the solicitor performs said agreement.—*Held*, 1. That the client failed in her proof of such agreement; 2. If proved, the agreement was without consideration, in that the five bonds and mortgages delivered were merely substituted in lieu of the mortgages foreclosed, covered part only of the property theretofore pledged, and was lesser security; 3. If proved, the client divested herself of the right to ask for its performance when she conveyed the property to the Deal Beach Realty Company, nothing in the record showing that such company asks, or has the right to ask, that the solicitor perform such agreement.

2. A solicitor, who had agreed to foreclose mortgages for a stipulated fee, was not entitled to the extra allowance for counsel fees allowed by the chancellor in the taxed costs.

3. Where a solicitor has business relations with his client on his own account, the court leans most strongly against the solicitor.

4. Where the client assumed that the solicitor would advance sufficient moneys to complete her buildings, and the solicitor did advance some moneys but not enough for the purpose; and thereby the client was placed in a position where the advances made were of very little value to her, under the circumstances of this case, the solicitor should not be allowed to charge the client for services rendered in connection with the finishing of such buildings, since the sums advanced were of little or no value to his client.

On bill, &c.

*Messrs. Heyman & Heyman,* for Randolph Perkins and Anna V. R. Greene.

*Mr. William M. Rysdyk* and *Mr. Robert H. McCarter,* for Sarah L. Robertson.

GRIFFIN, V. C.

The complainant, Perkins, filed three bills to foreclose three mortgages given to secure the payment of three bonds aggregating the sum of $25,000—two being for $8,000 each, dated March 25th, 1916, and the third of $9,000, dated November 20th, 1916.

The bill of the complainant, Greene, seeks to foreclose a mortgage given to Mr. Perkins to secure the payment of a bond of $8,000, dated March 25th, 1916, and assigned to her November 22d, 1916.

The recitals as to the debt in the four bills are substantially the same, so that a copy taken from one bill will serve for all, viz.:

"That on the 25th day of March, 1915, Maud J. Wagner, of the borough of Manhattan and county of New York, being indebted to the complainant in the sum of $8,000, executed to Randolph Perkins a bond of that date to secure that sum, payable on the 25th day of March, 1917, with interest thereon at the rate of six per cent. per annum, payable semi-annually, from the date of said bond."

The bill then recites that to secure the payment of the bond Maud executed the mortgage in suit.

The Greene bill has a change in the recital in one respect, viz., that Maud being indebted to the complainant, made the bond and mortgage to Perkins, which recital is manifestly untrue; she bought and took title to the bond and mortgage on November 22d, 1916, by assignment from Mr. Perkins, and Mr. Perkins stands to indemnify her on her purchase.

The recital above quoted in each of said bills is untrue. Maud was not indebted to Mr. Perkins in the three sums of $8,000 and the sum of $9,000 mentioned in the bills, nor was it the understanding of the parties that interest should be paid on the mortgages, although so demanded in the bills. The fact is that the indebtedness was that of Mrs. Robertson. This the complainant admits.

The mortgages were given under the following circumstances:

A judgment had been entered in the supreme court of the State of New York against Mrs. Robertson for upwards of $40,-

000 by Content & Company. Suit was brought thereon in this state, and Mr. Perkins was retained to defend. He was unsuc-cessful, but later procured an offer to settle for $32,500. Mrs. Robertson was not in funds to pay, and, with Mr. Perkins, sought to raise moneys for the purpose. This was accomplished by Mrs. Robertson giving her note, with Mr. Perkins as endorser, to the Union Trust Company for $24,000, and Mr. Perkins advancing from the Furniss Trust Estate $10,000. With these moneys the judgment was discharged. Of the $1,500 remaining, $487.50 was allowed a broker, and the balance was retained by Mr. Perkins.

Mrs. Robertson at this time was the owner of ten mortgages, aggregating about $107,000, nine covering lands at Deal and one at West End. These were assigned to Mr. Perkins, and by a memorandum dated July 12th, 1915, he acknowledged that nine were assigned to indemnify him on his endorsement, and one to secure the payment of the $10,000 and interest due to him as trustee of the Furniss Trust Estate.

These collaterals were placed in a safe deposit box under joint control.

Prior to the settlement of the Content judgment, Mr. Perkins, on July 2d and 3d, 1915, filed ten bills to foreclose said ten mortgages pledged as indemnity; final decrees were entered in all the suits, and, with the exception of the lands at West End contained in one mortgage, the lands were sold by the sheriff; seven tracts being purchased by Maud Wagner, who took title as trustee for Mrs. Robertson, and a stranger bought two, but refused to complete his purchase as to one for some alleged defect.

On March 25th, 1916, the sheriff delivered the deeds to Maud Wagner, and, on the same day, Maud executed to Mr. Perkins five bonds and mortgages in the sum of $8,000 each, in substitu-tion for the security of the mortgages at Deal which had been foreclosed. At the same time the pledge of the West End mort-gage continued as like security.

On March 30th, 1916, Mrs. Robertson and Maud Wagner signed a memorandum prepared by Mr. Perkins, stating that the five mortgages were executed to cover the amount due

Perkins for advances and the note in the Union Trust Company, which, at that time, is stated to be about $40,000.

Later, two of the $8,000 mortgages were delivered to Mrs. Robertson, and the $9,000 mortgage, dated November 20th, 1916, substituted.

What the purpose was in drawing five regular bonds and mortgages, under the circumstances, cannot be perceived, unless it was the expectation of the parties that they might be sold from time to time and the proceeds used to complete the buildings or discharge the debts aforesaid. The fact, however, remains that at the time of the filing of the bills they existed principally as indemnity to Mr. Perkins on his endorsement, and certain advances, and secured an indebtedness different from that described in the bonds.

Upon calling the attention of counsel to the anomalous condition of the pleadings, and indicating that the mortgages were merely collateral for a single debt, and that the various suits should be consolidated so that, in one suit, by one decree, the rights of all the parties in interest might be adjusted and finally determined, the suits were consolidated. That they should be consolidated is rather important to Mrs. Greene, who stands in the place of Mr. Perkins as assignee, with indemnity from Mr. Perkins, entitling her to be paid prior to any payment to Mr. Perkins.

Mrs. Robertson also filed her bill against Mr. Perkins substantially for an accounting and a reassignment of the mortgages contained in Mr. Perkins' suits. To this bill Mr. Perkins answered, and also filed a counter-claim, also asking for an accounting and for a decree that she might be directed to pay the amount due to him.

The causes were tried together.

The first question to be considered is the claim of Mrs. Robertson that Mr. Perkins agreed to advance her the sum of $26,500 to complete the buildings, and failed to do so, and, therefore, the suit should be stayed until he performed his agreement. Her claim is based upon an agreement which, she alleges, as follows: When the five bonds and mortgages were given she demurred to the amount of security, and only upon his agreeing to advance

the money to complete the buildings did she consent that Maud Wagner should execute the bonds and mortgages. Mr. Perkins denies any such agreement; and Maud Wagner, who was present at the time, was not called as a witness; therefore, the testimony is equally balanced, and the fact that Maud Wagner was not called to testify leads me to the conclusion that the agreement is not proven. But, even if proven, I think it was without consideration. Mr. Perkins held as collateral the mortgages foreclosed. When the sheriff made his deeds to Maud Wagner and the stranger, Mr. Perkins' record security was gone; but, in equity, he had a right to the possession of the deeds, and a lien on the land to indemnify him. Thus, when the five mortgages were made, which was less security than he before held, the new security could be said to be merely the substitution of one security for a lesser amount on the same property. In addition to this, Maud Wagner conveyed to the Deal Beach Realty Company, and thus divested herself of the right to ask for this performance, and there is nothing in the record which shows that the Deal Beach Realty Company asks, or has the right to ask, that Mr. Perkins perform this alleged agreement.

The complainants, therefore, are entitled to a decree in their favor; and, as Mr. Perkins stands to indemnify Mrs. Greene, she is entitled to be first paid before any payment is made to Mr. Perkins.

In ascertaining the amount due several questions arise: First, there was an agreement between Mrs. Robertson and Mr. Perkins that he should receive as a counsel fee $750 for foreclosing the ten mortgages. On turning to the taxed bills of costs I find, in the cases of *Robertson* v. *Deal Beach Realty Company,* Nos. 1, 2, 3, 4, 6, 7, 8 and 9, that the extra allowances allowed as counsel fees amount to $598. The costs have not been taxed in case No. 10 (West End property), nor in what is probably case No. 5, which is, probably, the property which the stranger rejected. Counsel for Mr. Perkins claims that he is entitled to the extra allowances as counsel fee in these cases, as well as the $750. Nothing was said to his client when he was retained about these extra allowances. To her it appeared as if this $750 covered all he was to receive for counsel fees for the services

rendered in the several foreclosure proceedings. Now, he seeks to recover, substantially, $750 more. This, I think, is inequitable. If a stranger had bought the property he would have to account for the extra allowances for counsel fees allowed by the chancellor or in the taxed costs. *Shreve* v. *Freeman, 44 N. J. Law 78.* Other cases on the subject are *Schomp* v. *Schenck, 40 N. J. Law 195; Strong* v. *Mundy, 52 N. J. Eq. 833.* I will, therefore, strike from the claim of the complainant the extra allowances for counsel fees contained in the taxed costs.

Second, touching the sum of $1,012.50, charged on the closing of the loan from the Union Trust Company, Mr. Perkins' testimony as to what these services were meant to cover is quite unsatisfactory. I have investigated the testimony, however, and find that, outside of a charge of $374.03, which will be referred to later, and an item of $500, parcel of the $10,000 note (which will also be referred to hereafter), no charge was made for services in the Content suit, in the procuring of the loan and the services attending thereon, nor for searches of the title prior to the date of the mortgages which were rendered necessary for the protection of Mrs. Robertson, in view of the condition of the title, and have reached the conclusion that for all of the services rendered the charge is reasonable. This sum I will therefore permit to stand as a charge covered by the Perkins mortgages.

The item of $374.03 covers petty disbursements and fees for services in small matters, and this will be allowed.

Also, the items of $174.27 and $9 paid for the Young judgment, and a fee of $75 paid to Thomas C. Perkins. This latter charge was incurred before the property was sold at foreclosure and was a small charge for making an estimate of what would be necessary to be done to complete the buildings if Maud Wagner became the owner.

The items also on page 6 of Mr. Heyman's brief, aggregating $151.93, will be allowed.

The item of $333.37 for insurance premiums, which expense was incurred because Mrs. Robertson did not deliver to Mr. Perkins the policies in accordance with the terms of the mortgages, I will allow. The evidence, as I recall it, is not clear that Mrs. Robertson delivered those policies to Mr. Perkins.

The charge of $500, which sum, added to the $9,500, was included in the $10,000 note, is the next item to be considered. After this property was purchased by Maud Wagner it is quite plain that Mr. Perkins, in a general way, intended to help Mrs. Robertson to complete these buildings, and, from time to time, he did advance to her sums amounting to $9,500. I am also inclined to the view that Mrs. Robertson rather relied upon Mr. Perkins to take care of her in this transaction; and, by reason of his failure to advance the balance of the moneys or procure them for her, she was placed in a rather awkard position. If this was a case purely between parties standing at arm's length, little could be said of it; but here the relation of attorney and client existed. Mrs. Robertson relied upon Mr. Perkins as her counsel and adviser. If he had not been her counsel, she probably would have used her own brains in figuring how she was going to raise the funds to complete these buildings; but, in dealing with her counsel and reposing confidence in him, she was content that he should handle the matter for her. In such transactions the court leans most strongly against the attorney, who, while acting as such, has business relations with his client on his own account. In the case of *Condit* v. *Blackwell, 22 N. J. Eq. 481* *(485)*, Mr. Justice Van Syckel, speaking for the court of errors and appeals, said: "The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close scrutiny of all transactions between them; and the law often interposes to set aside contracts which between other persons would be subject to no exception. In such cases the burden of establishing the perfect fairness, adequacy and equity of the negotiations is thrown upon the attorney, and, in the absence of such proofs, courts of equity treat the case as one of constructive fraud." See also *Porter* v. *Bergen, 54 N. J. Eq. 405.*

Now, in this case, Mr. Perkins added $500 to the $9,500 loan, which Mrs. Robertson was willing to pay, assuming that the moneys necessary for the completion of the buildings would be forthcoming; and the failure to furnish the additional funds placed Mrs. Robertson in a position where the advance of the $9,500 was of very little value to her, and, therefore, the services

rendered by Mr. Perkins, for which he charged $500, were of little or no value to her. I will, therefore, disallow this sum.

In the testimony it appears that Mr. Perkins holds an assignment of the mortgage on the West End property to secure the payment of the $9,500 item. The three bonds and mortgages held by him I do not find were given as security for this particular sum. I, therefore, find that Mrs. Robertson is indebted to Mr. Perkins for $9,500 and interest on the advances made for the completion of the buildings, which sum is secured by an assignment of the mortgage covering the West End property; and that the other items above mentioned are secured by the three mortgages to Mr. Perkins, the one mortgage of Mrs. Greene, and the mortgage or final decree now covering and affecting the West End property.

Mrs. Robertson is entitled to a credit for $3,886.74 received out of the Prout sale, May 27th, 1916.

I have also on my notes that Mr. Perkins received from Myer, April 2d, 1917, $2,818.54. I find on page 25 of the testimony that he speaks of having received $900 on account of a release from Myer, but that the release was never given, and says that the money should either be credited to Mrs. Robertson or repaid to Mr. Myer. I wish counsel would look into these two Myer items and advise me if the $2,818.54 was actually paid Mr. Perkins on April 2d, 1917, and also if this sum is in addition to the $900, and also if this money should be paid to Mrs. Robertson and credited to Mr. Perkins, and endorsed on the Myer bond, and he be notified to that effect, or whether it should be returned to Mr. Myer.

I have not considered the liability of Mr. Perkins on his endorsements, but, possibly, by this time, the note may be discharged; but, in any event, as the matter has not been presented to me by counsel, they should consider the question and present their views as to how this liability, if any, should be protected by the decree.

Some months ago, prior to the consolidating of the actions, I went over the figures carefully, with a view to saving the necessity and expense of a reference to a master. It may be that, as

to some of the smaller items, I am in error. Counsel may go over this memorandum, and if they have any suggestions to make with respect to any of these items, I wish they would do so in order that the proper corrections may be made, after which I will advise a decree, or decrees, in conformity with the forego-ing views, either as above stated or as revised after hearing from counsel.

Counsel will understand that the amount found due will carry interest.