The defendant John F.X. Ries is a member of the bar of this state, and has been practicing his profession in Atlantic City since his admission in 1906. He has lived since childhood in that city. The defendant Amos Babcock has been for many years a resident of the same city. He has for a long time been a contracting paperhanger. For the past few years he has, in a small way, engaged in dealing in real estate. He was made a defendant because title to a certain property in Philadelphia, Pennsylvania, was placed in him to facilitate its conveyance. Prior to the filing of the bill, and it should be said — promptly after the closing of the transaction — he fully accounted for the proceeds of the sale so far as any accounting is concerned.
The complainant is a widow of seventy or seventy-five years of age. She is illiterate and unable to write her name. During the lifetime of her husband they accumulated considerable property in Atlantic City (and some in Pennsylvania, all of which has been disposed of), of which, at the death of her husband, she became seized. This property, since its acquisition by them, has increased very greatly in value. At the time of the execution of the several writings complained of, her estate amounted in real estate and mortgages to, approximately, $110,000.
Since the death of her husband she lived for a considerable period with her only daughter. In 1923, as a result of quarrels between them, she left her daughter's home and has since lived with others. Some of the trouble between them was caused or actuated by the daughter suggesting her mother to be mentally incompetent.
In November, 1923, complainant asked Babcock, with whom she was well acquainted and who had worked for her at various times as a paperhanger, to recommend a lawyer *Page 640 
to represent her. He introduced Ries to her. This was, apparently, their first business meeting, although there was testimony indicating that each had known the other by sight for some period, both having lived in the same neighborhood.
Ries, ascertaining that the daughter had claimed or suggested the mental incapacity of her mother, and before he agreed to represent Mrs. Rhodes, asked her if she was willing to undergo an examination both as to her physical and mental condition. To this she consented. An examination was made by three reputable physicians of Atlantic City, who, in writing, certified that "we find her in good physical condition except for partial deafness and the arterio schlerosis usual in old age. Mentally she is clear and alert, except for uncertainty as to dates." This examination was made in the month of December, and the certificate bears date, "December 11th, 1923."
Ries then agreed to represent her as her attorney. On December 15th, 1923, she made a general power of attorney to Ries and Babcock as follows:
"Know all men by these presents, That I, Mary Rhodes, widow, of the city of Atlantic City, in the county of Atlantic and State of New Jersey, have made, constituted and appointed, and by these presents do make, constitute and appoint Attorney John F.X. Ries and Amos Babcock, and any attorney my said Attorney John F.X. Ries and Amos Babcock wish to have to assist them, my true and lawful attorney and attorneys, for me and in my name, place and stead, and to my use, to demand, sue for and receive of any person or persons, firm or firms, corporation or corporations, company or companies, concern or concerns, of every kind and nature whatsoever and wheresoever, and to give acquittances for all sums of money, debts, dues and demands whatsoever, which are due and owing, or of right belonging unto me at this time, and to use all lawful means for the recovery thereof, and to compound and agree for the same; to ask, demand, distrain for, collect and receive all such rents and arrears of rent as now are or may hereafter be due or owing to me from the tenants occupying any and all property that I own or in which I have any kind of an interest whatsoever and wheresoever, or any of them, as tenants or occupants of any lands, tenements or hereditaments belonging to or claimed by me, or which may be due from or payable by any other person or persons whomsoever, as tenants, occupiers, lessees or assignees of any term or terms, of such lands, tenements or hereditaments, or any part of such lands, tenements or hereditaments, and, upon receipt thereof, to give proper acquittances and discharges *Page 641 
thereof; to grant, bargain and sell any and all of my lands, tenements and hereditaments or any part thereof for such price or prices and on such terms as to my said Attorney John F.X. Ries and Amos Babcock and the attorney assisting my said attorney, John F.X. Ries and Amos Babcock, if they so desire, shall seem meet, and without the purchaser or purchasers being responsible for or concerned in any respect whatsoever in regards to, or as to the use or disposition of the purchase-money, and for me and in my name, to make, execute, acknowledge and deliver good and sufficient deeds and conveyances for the same, either with or without covenants and warranty; to exercise the general control and supervision over all my lands, tenements and hereditaments, to prevent, by all lawful means, the commission of any trespass or waste, or other injury thereupon; and, at my expense, and under the advice of such other counsel as my said attorney, John F.X. Ries and Amos Babcock, may employ, to sue for protection against any such injury, and to collect, recover and receive and compound for, any damages which may accrue by means of the commission of any trespass or waste upon my lands, tenements and hereditaments, or any part thereof, by any person whomsoever, and to cause insurance to be had and made thereon; to draw and accept bills of exchange and orders, and to make, endorse and transfer promissory notes and other instruments, signing my name thereto; to sign, seal and deliver bonds and obligations; to give receipts, acquittances and discharges; to prosecute any action or actions in my name; to buy, sell, exchange, barter and rent land and real estate, and for that purpose to receive, sign, seal, deliver and execute deeds, leases, contracts and other instruments, and generally to do and perform all matters and things which may be requisite or proper to carry on my business; and for me and in my name, to receive and take all or any rents, issues and profits of all or any such lands, tenements, hereditaments, or any of them, and to let the same in such manner as my said attorney, John F.X. Ries and Amos Babcock so desire, shall think proper, and from time to time renew leases, and also all deeds, leases, agreements and writings in that behalf requisite and necessary for me and in my name, to make, seal and deliver as my acts and deeds, and for me, and in my name, to settle and adjust with each and every person or persons, all accounts, dues and demands, subsisting or to subsist between them, any or either of them, and me, and to compound, arbitrate and agree to the same, in such manner as my said attorney, John F.X. Ries and Amos Babcock so desire, shall think proper, and also to pay the taxes, insurance, water rents, sewerage and all other expenses for repairs of every kind and nature whatsoever and all other expenses of every kind and nature whatsoever that may arise for the protection and care of said lands, tenements and hereditaments; to borrow upon the security of my lands, tenements and hereditaments any sum or sums of money as my said attorney, John F.X. Ries, and Amos Babcock so desire, shall think proper, and to sign, seal and deliver a bond or bonds for the payment of such sums, and to sign, seal and deliver, as collateral thereto, a mortgage or mortgages upon said *Page 642 
estate, lands, tenements and hereditaments, with the usual power of sale, and interest and insurance clauses, and other usual provisions and covenants; and also to place out on mortgage or any other kind of security any and all money that I have or may have with full power to draw and take out any and all money that I have in any bank or trust company, and all banks and trust companies, and with full power to take charge of, to draw and take out of and from any person or persons, firm or firms, company or companies, corporations or corporation, or any and all concerns of every kind and nature whatsoever and wheresoever all money and any and all business in his, her, their or its control. In consideration of my said attorney, John F.X. Ries, and Amos Babcock, or any attorney, my attorney, John F.X. Ries, shall select, acting as my attorney and using whatever money in the judgment of my said attorney, John F.X. Ries, and Amos Babcock, is necessary for my keep, and my said attorney, John F.X. Ries, and Amos Babcock, or any attorney my said attorney, John F.R. Ries and Amos Babcock shall select, also receiving five per cent. commission on all money handled and also receiving all such compensation that is proper for them and their attorney or attorneys' services in the performance of the duties required in this power of attorney. In consideration of any of the duties required and performed under this power of attorney by my said attorney, John F.X. Ries, and Amos Babcock, or any attorney my said attorney, John F.X. Ries, and Amos Babcock shall select, this power of attorney shall continue in existence from the date of this instrument for the period of fifty years without any power of revocation of this power of attorney on my part; giving and granting unto my said attorney, John F.X. Ries, and Amos Babcock or any attorney my said attorney, John F.X. Ries, and Amos Babcock shall select to assist them without bond or other security, full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes as I might or could do if personally present, hereby ratifying and confirming all that my said attorney, John F.X. Ries, and Amos Babcock, or any attorney my said attorney, John F.X. Ries, and Amos Babcock wish and select to assist them shall lawfully do or cause to be done by virtue hereof.
"It is expressly understood and agreed upon by all the parties to this power of attorney that all papers, books and legal documents of every kind and nature whatsoever, shall remain in the control and custody of my said attorney, John F.X. Ries.
"I also give my said attorney, John F.X. Ries, and Amos Babcock full power to collect all money due me from Frederick W. Wyld and also get all personal property of mine of every kind and nature whatsoever from said Frederick W. Wyld; and also to get all my clothes and personal property of mine of every kind and nature whatsoever from my daughter, Mary Woods, also known as Mamie Woods, particularly to get from the property 2618 Monterey avenue, Atlantic City, New Jersey, all personal property of mine of every kind and nature whatsoever." *Page 643 
It is to be noted that this power was to continue for the term of fifty years, and was irrevocable. Ries and Babcock were to receive five per cent. of all moneys handled by them, and were to receive "proper compensation for their services." All documents and papers of Mrs. Rhodes were to be placed in Ries' hands and to be retained by him.
On March 12th, 1924, the daughter instituted proceedings in lunacy against the mother, and a commission was appoined by this court. This commission began the taking of testimony on April 7th, 1924, and the hearings continued until the 16th day of April, 1924.
Prior to the first hearing by the commission, on March 22d 1924, an order was entered permitting her to withdraw from her money in bank such amount, not exceeding $1,500, as should be found necessary for her to properly defend herself in the proceedings.
The day before the first hearing held by the commissioners,i.e., on April 6th, 1924, she executed a paper in which, after reciting the fact that she had engaged Ries as "agent, attorney-at-law and counselor-at-law;" that he had faithfully acted as agent, attorney-at-law and counselor-at-law in every respect; that she had been unable to pay him any sufficient fee, or to reimburse him for any costs or charges, and that Ries had agreed to represent her in any litigation concerning her mental condition; agreed with him (Ries)
"that for the services rendered and expenses incurred heretofore, and the services hereafter to be rendered and expenses to be incurred, and in his office as aforesaid, meaning my agent, attorney and counselor-at-law, John F.X. Ries, and also for the expenses above described, and I assign as explained above and below, and also that I shall and will pay him, John F.X. Ries, a sum of money equal to one-half of my property, real and personal, in every respect whatsoever, at any time as said John F.X. Ries wishes, desires or requests. The said portion, one-half, to be paid out of the total balance of my property, real and personal, in every respect whatsoever I have or may have and it is
"Further covenanted and agreed by me that I hereby expressly waive and quit-claim by virtue of the foregoing, all and every right I have or may have to adjust, compromise, settle or enter into any agreement whatsoever respecting my said property, real and personal, *Page 644 
affecting and altering my rights except by and only by him and with the advice and consent of the said John F.X. Ries, my agent, attorney and counselor-at-law; and it is
"Further covenanted and agreed by me that in the event that this agreement is in any way or at any time hereafter violated by me, or changed by me under any circumstance or circumstances, the said John F.X. Ries, my agent, attorney and counselor-at-law, may forthwith have his proper remedy and enforce the full and entire terms and conditions of this agreement, without further effort on his part to carry out the office of agent, attorney and counselor-at-law herein imposed upon him, and I make this agreement irrevocable, and desire the same may be recorded as such."
On April 16th, 1924, the jury in the lunacy proceedings returned a verdict declaring her to be of sound mind and memory and the commission so reported, and proper orders were filed.
The day after the return of the jury, on April 17th, 1924, she executed a power of attorney wherein she authorized Ries to sell certain of her real estate and one or more mortgages for the purpose of paying bills, c. There was included in this instrument the following:
"I hereby request, direct, authorize and empower my said attorney, John F.X. Ries, to bank all of the above said money of every kind and nature whatsover in his own name, with the further object that I shall not be troubled or bothered about depositing money in my own name in bank, and also that I shall not be troubled or bothered about signing, making finger-prints or making my mark on checks against any account I have or may have in any one or more banks.
"And in consideration of all of the above, I hereby request and direct that my said attorney, John F.X. Ries, shall not be required at any time whatsoever to give any account or accounting of any money he has or may receive by reason of the above, or of any money he has or may spend or disperse by reason of the above. In consideration and by reason of the above, and in every respect whatsoever, I also remise, relieve, release and discharge by said attorney, John F.X. Ries, his heirs, executors and administrators, from any and all mistakes of every kind and nature whatsoever, and for all and any shortages of money by reason of the above. I also, in consideration and by reason of the above, in every respect whatsoever, bind myself, my heirs, executors and administrators."
This was duly acknowledged, and on April 26th, 1924, she made and executed a will, in which, after giving her daughter and grandchildren each a small amount, a Mrs. *Page 645 
McGilly, with whom she was living, the sum of $5,000, the Babcock the sum of $10,000, she devised and bequeathed all the residue of her estate to Ries.
On August 19th, 1924, she, by deed of assignment bearing that date, assigned for the consideration of one dollar and other good and valuable consideration to Ries absolutely, five several bonds and mortgages aggregating $62,500. This instrument was duly acknowledged and recorded.
On the same day she conveyed to Ries all the real estate of which she was seized, and assigned to him the same five bonds and mortgages.
In this latter conveyance it was stated:
"Whereas, The grantor is seized and possessed of the real estate and personal property hereinafter described and mentioned, situate in the city of Atlantic City, in the county of Atlantic and State of New Jersey, and in the city and county of Philadelphia and State of Pennsylvania; and
"Whereas, The said grantor, by reason of the ownership and possession of said property, has been heretofore vexed, harassed and annoyed, and is threatened to be hereafter further vexed, harassed and annoyed, by her children and grandchildren seeking to obtain and deprive her of the control thereof and of her person; and
"Whereas, It is the intention of the said grantor by this present indenture to give, grant, sell, convey and assign, transfer, set over and confirm unto the said grantee, his heirs, executors, administrators and assigns, all the estate, right, title and interest, property, claim and demand of every kind and nature whatsoever, either at law or in equity, whether vested or expectant, and all and every part thereof, in and to any and all real estate and personal property of which the said grantor is now, or may hereafter be, seized, possessed or entitled.
"To have, hold, receive and take all the real estate and personal property aforesaid, the hereditaments and premises hereby granted, assigned, conveyed and transferred, or mentioned and intended so to be, with the appurtenances, unto the said grantee, his heirs, executors, administrators and assigns forever, reserving and excepting, nevertheless, thereout and therefrom, and from the operation of this indenture, unto the said grantor the use and enjoyment of the whole net income arising or accruing from the real and personal property hereby granted, conveyed and assigned, for and during the term of the natural life of her, the said grantor, and this indenture is delivered and accepted upon the express stipulation and undertaking that the said grantee shall and will [1] sell and convey, in fee-simple, the real estate above described and hereby conveyed, at such times, for such price and upon such terms or conditions as to payment as he *Page 646 
may see fit, and that until the same be sold he will rent the same and collect and receive the rents, issues and profits thereof; [2] that he will, from the proceeds of said personal property and real estate when sold, or from the rents, issues, profits and income thereof until sold, first fully pay and discharge the just debts now due from, and hereafter to be incurred by, the said grantor, and will invest and keep invested the balance thereof, then remaining either in mortgages on real estate or such other good securities as he may select and approve, and collect and receive the income therefrom; [3] that he will apply the said rents, issues and profits, and the said income arising from such investments, or so much thereof as may be necessary and proper for the purpose, from time to time, and as often and in such manner as he, in his discretion, may think right and best, or the said grantor may reasonably require, to the comfortable support of her, the said grantor, during the whole period of the natural life of her, the said grantor, so that neither the said rents, issues and profits, interest or income, or any part thereof, shall or may, at any time hereafter, be liable or subject in any manner whatever to the control, engagements, debts or liabilities of her, the said grantor; and [4] that he will, as soon as conveniently may be after the death of the said grantor, from any unexpended interest or income then remaining in his hands, or from the principal of said investments, or any of them, or from the proceeds of such sales, or any of them, pay the expenses of the decent and proper interment of her, the said grantor; and that [5] thereafter and thenceforth forever, as well the said principal of said investments, and the interest and income thereof, as the said rents, issues and profits of the real estate then remaining and being unsold, and all unexpended income, interest, rents, issues and profits in his hands then remaining shall become and be discharged and released, and the said grantee shall thereafter have and hold the same for his own use and benefit, free and discharged of the charge thereon hereby imposed or intended to be imposed."
Prior to the execution of this latter paper, Ries sent Mrs. Rhodes to the office of Charles C. Babcock, a counselor-at-law, with offices in the same building as Ries, and who is not to be confused in any way with the defendant Babcock. Babcock was requested to explain the effect of these papers to her. This he did. Mr. Ries had his stenographer present to take stenographically the interview. Mr. Babcock declined to have the papers executed before him and to take her acknowledgment thereto. Mrs. Rhodes then returned to Ries' office and there met Elwood C. Weeks, also a counselor-at-law. Weeks and Ries occupy adjoining offices, each using the library and entrance rooms in common. Weeks also explained *Page 647 
to her the effect of the papers (this interview also being taken stenographically by the same stenographer). Weeks then being satisfied, caused or permitted Mrs. Rhodes to execute the papers, took her acknowledgment and affixed his certificate thereof thereto.
This remained the situation until the month of December, 1924, or January, 1925, at which time Mrs. Rhodes called upon Judge Clarence L. Cole, of the firm of Cole Cole, members of the bar, and interviewed him concerning the legal status of her property.
Judge Cole wrote Mr. Ries a letter, asking him for a statement of his relations with Mrs. Rhodes, and whether he was willing to re-transfer to her any property and securities which he might be holding.
To this letter and demand Ries made no reply. He, however, immediately called upon Mrs. Rhodes, who shortly thereafter, in company with Babcock, came to Ries' office. She there signed a letter discharging Cole, and then called at Cole's office, delivered the letter (in Judge Cole's absence), and left there a sum of money as a fee for services rendered. This money was furnished and advanced by Babcock.
She evidently thereafter again called upon Judge Cole, as the bill was filed on April 28th, 1925.
The complainant was incoherent upon the witness-stand, and clearly evidenced that she was at that time very weak mentally.
She was, without doubt, highly incensed at her daughter because she had instituted the proceedings in lunacy, and at her grandchildren because she believed their conduct toward her was improper. She had no one else whom she felt had any claims upon her. She felt most kindly toward Ries, whom she believed had saved her from incarceration in an insane asylum, and had saved to her the custody and control of her property.
All of the papers executed by her had either been prepared by Ries or by his suggestion.
These papers evidence the steps by which Ries gained the control of the property — *Page 648 
(1) The power of attorney to Ries and Babcock dated December 15th, 1923. This was made irrevocable, to last for fifty years, a period greatly longer than her expectancy of life. A commission of five per cent. on all moneys handled, and still such further "proper consideration" should be paid to them, and Ries was to have custody of all papers of title, c.
(2) The order permitting her to withdraw money to finance her defense in the lunacy proceedings.
(3) The compensation agreement, dated April 17th, 1924, whereby she agreed to pay to Ries, approximately, $55,000 for his services in her behalf.
(4) The execution of the will on April 26th, 1924.
(5) The absolute assignment to Ries of the five mortgages, dated August 19th, 1924.
(6) The conveyance to Ries of all her real estate and the said five mortgages, subject to the reservation of such part of the net income "which she may reasonably require for her comfortable support during her life, and upon her death the principal and income remaining unexpended to become Ries' absolutely."
The defendants rely to a great extent upon Sherman v.Gleason, 3 N.J. Mis. R. 708, decided by Vice-Chancellor Buchanan on July 7th, 1925, shortly before the hearing in this case.
As in the case at bar, "the bill was filed by the complainant, a widow aged seventy-six or seventy-seven years, for decree of reconveyance to her of premises conveyed by her to defendant, on the ground that the conveyance was without consideration, was improvident and stripped her of most of her property, was made by her without fully understanding the nature and effect of the transaction and without her having independent advice, and was the result of undue influence. The deed reserved a life estate to complainant." In the case at bar the conveyance was made, "excepting, nevertheless, thereout and therefrom, and from the operation of this indenture, unto the said grantor the use and enjoyment of the whole net income arising or accruing from the real *Page 649 
and personal property thereby granted and conveyed, for and during the term of the natural life of her, the said grantor," and the indenture was delivered and accepted upon the express stipulation and undertaking "that the said grantee shall and will [inter alia] collect the rents, issues, pay the debts, and [3] he will apply the said rents, issues and profits, and the said income arising from such investments or so much thereof as may be necessary and proper for the purpose from time to time, and as, after and in such manner as he, in his direction, may think right and best, or the said grantor may reasonably require, to the comfortable support of her the said grantor, so that neither the said rents, issues and profits, interest or income, or any part thereof, shall or may, at any time hereafter, be liable or subject in any manner whatever to the control, engagements, debts or liabilities of her the said grantor." Then follows a covenant for her proper interment — then the principal and unexpended income shall become discharged and released and become his absolutely.
The rule is: "In all transactions between parties occupying relation, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed, and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood."Hall v. Otterson, 52 N.J. Eq. 522 (at p. 528); S.C. onappeal, 53 N.J. Eq. 695. "Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper advice, independently of the other." Haydock v. Haydock, 34 N.J. Eq. 570. "The rule to be gathered from the English and American cases is that the burden of proof is cast upon the donee to establish that the donor fully appreciated what he was doing, or, at all events, in the doing had the benefit of disinterested and competent advice." Coffey
v. Sullivan, 63 N.J. Eq. 302; Slack v. Rees, 66 N.J. Eq. 447. *Page 650 
This case at bar clearly comes within this rule, and is not within the findings of Vice-Chancellor Buchanan in Sherman v.Gleason, supra, who said: "Complainant was not dependent on defendant; they did not live together; he did not occupy a dominant position toward her; her mental capacity and her powers of volition and determination were strong and unimpaired, and, moreover, she did not strip herself of her means of support."
Mr. Charles C. Babcock, to whom complainant was sent for "independent advice," declined to have the instrument executed before him, and the great care in having a complete record made of the interview between the complainant and Mr. Babcock, and between the complainant and Mr. Weeks, indicates very plainly that the defendant understood this rule, its application to the intended conveyance — hence, the attempt to secure the evidence necessary to prove such independent advice.
It is impossible to find proof in the evidence produced that this interview with Mr. Weeks was "well understood" by the complainant, even if it rose to the dignity of disinterested and competent advice, a fact which I am unable to find.
In the case of Condit v. Blackwell, 22 N.J. Eq. 481 (at p.485), Mr. Justice Van Syckel, speaking for the court of errors and appeals, said: "The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close scrutiny of all transactions between them, and the law often interposes to set aside contracts which, between other persons, would be subject to no exception. In such cases, the burden of establishing the perfect fairness, adequacy and equity of the negotiation is thrown upon the attorney, and, in the absence of such proof, courts of equity treat the case as one of constructive fraud."
"In such transactions the court leans most strongly against the attorney, who, while acting as such, has business relations with his client on his own account." Perkins v. Deal Beach RealtyCo., 92 N.J. Eq. 526 (at p. 533). *Page 651 
These two assignments and the conveyance of the real estate must be set aside.
It is, of course, unnecessary to now consider the validity of the will.
Each successive step in the transfer to Ries was divesting Mrs. Rhodes of her control to and title of her property to a greater extent than the preceding one, and in each case Ries was obtaining a greater control and title to more property, until the final culmination, when he received all her property subject only to such payments as she should reasonably require.
The oral argument of the solicitor of the complainant at the time of the hearing was leveled almost entirely at the compensation agreement. There can be no doubt but that this document executed by the complainant was to be in payment and as compensation to her attorney, who it must be said had rendered very valuable services, which had resulted favorably to her, and had permitted her to retain the control of her liberty and of her property.
The case in this respect, therefore, involves the additional question as to how far the validity of this agreement of April 17th, 1924, is affected by the fact that it was providing payment by the client of compensation to her attorney.
Finding that the absolute assignment of the mortgages, bearing date August 19th, 1924, and the conveyance of the same date, as well as the power of attorney of December 15th, 1923, must be set aside, what effect should be placed upon the compensation agreement?
The rule is that the burden of establishing the fairness, adequacy and equity of the negotiations rests upon the attorney, and the security or conveyance taken will only be allowed to stand as security for the amount shown to be fully due. 1 StoryEq. § 311; Brown v. Bulkley, 14 N.J. Eq. 451; Condit v.Blackwell, 22 N.J. Eq. 481; Porter v. Bergen, 54 N.J. Eq. 405;Wagner v. Phillips, 78 N.J. Eq. 33.
A reference will be made to a master to ascertain the amount the defendant should receive as compensation, and to state an account of the moneys received and disbursed by *Page 652 
Ries, and the conveyances will be allowed to stand as security until the amount is ascertained.
Upon the payment of the amount, if any, due Ries, the conveyances will be set aside.